# IN THE SUPREME COURT OF IOWA

No. 13–1158

Filed May 9, 2014

**AFSCME IOWA COUNCIL 61,**
    Appellant,

and

**STATE OF IOWA, DEPARTMENT OF ADMINISTRATIVE SERVICES,**
    Appellee,

vs.

**IOWA PUBLIC EMPLOYMENT RELATIONS BOARD,**
    Appellee.

---

Appeal from the Iowa District Court for Polk County, Michael D. Huppert, Judge.

Public employee organization appeals district court decision on judicial review that reversed ruling of Public Employment Relations Board on scope-of-bargaining issue. **DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; REMANDED WITH INSTRUCTIONS.**

Mark T. Hedberg of Hedberg & Boulton, P.C., Des Moines, for appellant.

Thomas J. Miller, Attorney General, and Matthew T. Oetker, Assistant Attorney General, for appellee State of Iowa, Department of Administrative Services.

Ann M. Smisek, Des Moines, for appellee Iowa Public Employment Relations Board.

**WATERMAN, Justice.**

The fighting issue in this appeal is whether a collective bargaining proposal addressing outsourcing of work performed by public employees is a "procedure[] for staff reduction" and therefore a mandatory subject of bargaining pursuant to Iowa Code section 20.9 of the Public Employment Relations Act (PERA), Iowa Code chapter 20. *See* Iowa Code § 20.9 (2013). The Iowa Public Employment Relations Board (PERB) determined that the State of Iowa's Proposal 8(B) is subject to mandatory bargaining. The State and AFSCME Iowa Council 61 (AFSCME) filed cross-petitions for judicial review. The district court reversed PERB's ruling on this issue, and AFSCME appealed. We retained the appeal.

In *Waterloo Education Association v. Iowa Public Employment Relations Board* (*Waterloo II*), our court thoroughly reviewed the history of public employee collective bargaining and the methods courts and agencies use to resolve scope-of-bargaining issues. 740 N.W.2d 418, 420–28 (Iowa 2007), *abrogated in part by statute*, 2010 Iowa Acts ch. 1165, § 6 (codified at Iowa Code § 20.6(1) (2011)). We reaffirmed a two-pronged test for ascertaining whether a proposal is a mandatory or permissive subject of bargaining. *Id.* at 429. PERB used the *Waterloo II* test. The parties disagree over the meaning and effect of Proposal 8(B) and disagree over its predominant purpose under the *Waterloo II* test. This case presents our first opportunity to review PERB's application of that test since the legislature amended PERA to expressly grant PERB the authority to interpret and apply the chapter. *See* 2010 Iowa Acts ch. 1165, § 6 (codified at Iowa Code § 20.6(1) (2011)). Our review "do[es] not pass in any way on the merits" of the proposal. *Waterloo II,* 740 N.W.2d at 431.

For the reasons explained below, we hold that Proposal 8(B), as interpreted by the State to require staff retention, is a permissive subject of bargaining. However, Proposal 8(B) is a mandatory subject under AFSCME's interpretation, which permits the employer to "bump" other public employees after transfers resulting from outsourcing. The record is inadequate to determine which interpretation is correct. Accordingly, we affirm the district court's judgment in part, reverse in part as to Proposal 8(B), and remand for further proceedings consistent with this opinion.

## I. Background Facts and Proceedings.

AFSCME[1] is an employee organization certified by PERB to represent certain State employees in collective bargaining. In November 2012, AFSCME began negotiating its 2013–2015 collective bargaining agreement with the State. On November 30, the State provided its initial bargaining position for the terms of the new contract. The State proposed deleting certain contract provisions from the existing contract. The State asserted the proposed deletions "concern[] permissive subjects which the State need not negotiate in accordance with Iowa Code section 20.9."

Proposal 8(B) of the State's bargaining position deleted a provision of the then-current collective bargaining agreement, which stated:

> If, as a result of outsourcing or privatization following an Employer initiated competitive activities process, positions are eliminated, the Employer shall offer affected employees other employment within Iowa State government. Other employment shall first be sought within the affected employee's department and county of employment. Affected employees accepting other employment shall not be subject

---

[1]AFSCME is an acronym for the American Federation of State, County and Municipal Employees.

to loss of pay nor layoff pending placement in other employment under this Section. Neither shall such employees be subject to a decrease in pay in their new position. However, affected employees will not be eligible for any pay increase until such time as their pay is within their new pay grade range. In the alternative, employees may elect to be laid off.

Employees placed in other employment under this Section, as well as those electing to be laid off, will be eligible for recall to the classification held at the time of outsourcing or privatization, in accordance with Article VI of this Agreement.

AFSCME disputed the State's classification of this provision as a permissive bargaining subject, arguing that the provision was instead a "procedure[] for staff reduction," which is a mandatory bargaining subject under Iowa Code section 20.9 (2013).

Because the parties could not agree whether this provision, and others, were mandatory bargaining subjects, the State filed a "Petition for Expedited Resolution of Negotiability Dispute" with PERB. PERB ruled on the State's petition on February 8, 2013. It rejected the State's argument that the predominant purpose of Proposal 8(B) is to retain staff. PERB found the predominate purpose of Proposal 8(B) "is to designate a process for implementing a staff reduction that occurs due to outsourcing." PERB was not persuaded by the State's argument that Proposal 8(B) "makes outsourcing economically infeasible because [the State] must maintain employment for displaced employees under the proposal." It ruled "[t]his argument relates to the merit of the proposal rather than the test of negotiability." PERB further found Proposal 8(B) did not infringe on the State's authority to decide to reduce staff, but instead "focuses on what happens once a decision to reduce staff has been made." It therefore concluded "[b]ecause the predominant purpose of [Proposal 8(B)] is to set out a process for implementing procedures for

a staff reduction, it is mandatory." PERB concluded the State's other proposals were permissive.

Both the State and AFSCME filed petitions for judicial review. On July 12, the district court affirmed PERB's decision on all proposals except for Proposal 8(B). The district court determined Proposal 8(B) did not fit within the meaning of "procedures for staff reduction," explaining:

> [T]he statutory phrase "procedures for staff reduction" relates to the manner in which the contemplated reduction will take place, not how to manage the consequences associated with a reduction that has already taken place. In the court's mind, this hinges upon the word "for," which is defined in this context as a function word used to indicate purpose or an intended goal. Merriam-Webster's Collegiate Dictionary 454 (10th ed. 2001); see also Wiseman v. Armstrong, 269 Conn. 802, 811, 850 A.2d 114, 119 (2004). In other words, for the procedures in question to be considered mandatory under § 20.9, they must have as their purpose, goal or object a reduction in staff. As measured by this standard, proposal 8(B) falls short; its predominant purpose relates to the aftermath of a reduction that has already resulted from outsourcing or privatization.

The district court thus reversed PERB's ruling that Proposal 8(B) was a mandatory bargaining subject, without reaching the State's argument that the predominant purpose of Proposal 8(B) is staff retention.

AFSCME appealed the district court's ruling regarding Proposal 8(B). PERB and AFSCME argue we should uphold PERB's ruling, while the State urges us to affirm the district court's ruling.

## II.  Scope of Review.

Judicial review of an agency ruling is governed by Iowa Code chapter 17A.  *See Iowa Med. Soc'y v. Iowa Bd. of Nursing*, 831 N.W.2d 826, 838 (Iowa 2013).  The district court reviews the agency's decision in an appellate capacity.  *Id.*  In turn, " '[w]e review the district court's decision to determine whether it correctly applied the law.' "  *Id.* (quoting *City of Sioux City v. GME, Ltd.*, 584 N.W.2d 322, 324 (Iowa 1998)).  "We

must apply the standards set forth in section 17A.19(10) and determine whether our application of those standards produce[s] the same result as reached by the district court." *Auen v. Alcoholic Beverages Div.*, 679 N.W.2d 586, 589 (Iowa 2004).

In *Waterloo II,* decided in 2007, we recognized that "[w]hether a proposal is a mandatory subject of collective bargaining, as defined by Iowa Code § 20.9, has not been explicitly vested in PERB's discretion." 740 N.W.2d at 420. In 2010, the legislature responded by amending Iowa Code section 20.6 to expressly grant PERB authority to "[i]nterpret, apply, and administer" the provisions of Iowa Code chapter 20. 2010 Iowa Acts ch. 1165, § 6 (codified at Iowa Code § 20.6(1) (2011)) (replacing language that authorized PERB only to "[a]dminister" the provisions of chapter 20). The same year, in *Renda v. Iowa Civil Rights Commission*, we noted, "The question of whether interpretive discretion has clearly been vested in an agency is easily resolved when the agency's enabling statute explicitly addresses the issue." 784 N.W.2d 8, 11 (Iowa 2010). Because the legislature has now expressly vested PERB with discretion to interpret and apply chapter 20, we will review PERB's interpretation and application of section 20.9 to determine if it is "irrational, illogical, or wholly unjustifiable." Iowa Code § 17A.19(10)(*l*), (*m*) (2013).

> A decision is "irrational" when it is "not governed by or according to reason." W*ebster's Third New International Dictionary* 1195. A decision is "illogical" when it is "contrary to or devoid of logic." *Id.* at 1127. A decision is "unjustifiable" when it has no foundation in fact or reason. *See id.* at 2502 (defining "unjustifiable" as "lacking in . . . justice"); *id.* at 1228 (defining "justice" as "the quality or characteristic of being just, impartial or fair"); *id.* (defining "just" as "conforming to fact and reason").

*Sherwin-Williams Co. v. Iowa Dep't of Revenue,* 789 N.W.2d 417, 432 (Iowa 2010).

"The burden of demonstrating . . . the invalidity of agency action is on the party asserting invalidity." Iowa Code § 17A.19(8)(*a*). We may affirm the district court on an alternative ground that is supported by the record and urged by the prevailing party. *Hawkeye Foodservice Distrib., Inc. v. Iowa Educators Corp.*, 812 N.W.2d 600, 609 (Iowa 2012).

**III. Analysis.**

PERA governs collective bargaining between public employers and public employee organizations. *Waterloo II*, 740 N.W.2d at 421. "Iowa's PERA contains both a provision establishing mandatory collective bargaining on specified matters and a contrapuntal management rights clause preserving exclusive, public management powers in traditional areas." *Id.* The public management powers are found in Iowa Code section 20.7. That section expressly retains for public employers "the exclusive power, duty, and the right to," among other things, "[h]ire, promote, demote, transfer, assign and retain public employees in positions within the public agency"; "[r]elieve public employees from duties because of lack of work or for other legitimate reasons"; and "[d]etermine and implement methods, means, assignments and personnel by which the public employer's operations are to be conducted." Iowa Code § 20.7(2), (5), (6). Iowa Code section 20.9 then enumerates seventeen topics that are subject to mandatory collective bargaining procedures:

> The public employer and the employee organization shall meet at reasonable times . . . to negotiate in good faith with respect to wages, hours, vacations, insurance, holidays, leaves of absence, shift differentials, overtime compensation, supplemental pay, seniority, transfer procedures, job classifications, health and safety matters, evaluation procedures, *procedures for staff reduction*, in-service training and other matters mutually agreed upon.

Iowa Code § 20.9 (emphasis added). This list is exclusive. *Waterloo II*, 740 N.W.2d at 425.

The classification of a bargaining proposal as either mandatory or permissive "is a critical issue." *Id.* at 421.

> If a subject is within the scope of mandatory bargaining, the parties are required to bargain over the issue, and if agreement is not reached, the statutory impasse procedures, which ultimately lead to binding arbitration, are available. If, on the other hand, the proposal is a permissive subject of bargaining under section 20.9, the public employer may reserve the right to decide the issue unilaterally by declining to participate in bargaining. When the employer declines to bargain over a permissive subject, the impasse procedures in PERA are not available and decisions related to the subject remain within the exclusive power of the public employer.

*Id.* at 421–22 (citation omitted).

When PERB resolves a negotiability dispute, it decides only whether a subject is a mandatory topic of bargaining—not whether a specific proposal is substantively meritorious. *See* Iowa Admin. Code r. 621—6.3(1) (defining "negotiability dispute" as "a dispute arising in good faith during the course of collective bargaining as to whether . . . a proposal which is subject to collective bargaining under Iowa Code section 20.9 is a mandatory topic of bargaining"). In the same way, on appeal, "we do not pass in any way on the merits" of a negotiability dispute. *Waterloo II*, 740 N.W.2d at 431. We review only "the question of whether [the disputed topic] . . . must be determined, if possible, by the parties themselves through good faith negotiations and in the event of impasse, through binding arbitration as provided in PERA." *Id.*

Under our deferential standard of review, our task today is to decide if PERB's interpretation of "procedures for staff reduction" in Iowa Code section 20.9 and its application of that statute to Proposal 8(B) are "irrational, illogical, or wholly unjustifiable." *See* Iowa Code

§ 17A.19(10)(*l*), (*m*). The topics listed in Iowa Code section 20.9 cannot be defined "in a fashion so expansive that the other specifically identified subjects of mandatory bargaining become redundant," nor are the topics "subject to the narrowest possible interpretation." *Waterloo II*, 740 N.W.2d at 429–30. Consistent with legislative intent, PERB must give each topic in section 20.9 "its common and ordinary meaning within the structural parameters imposed by section 20.9." *Id.* at 430.

In determining whether Proposal 8(B) presents a mandatory bargaining topic, PERB employed the analytical framework our court cemented in *Waterloo II*. *See id.* at 428–29. In *Waterloo II*, we recounted how our court adopted a straightforward definitional "topics" test in *Charles City Community School District v. Public Employment Relations Board*, 275 N.W.2d 766, 772–73 (Iowa 1979), but also struggled with the relationship between the exclusive rights of management in section 20.7 and the mandatory bargaining provisions in section 20.9. *Waterloo II*, 740 N.W.2d at 426. Over the years, our court vacillated between a strict topics test and a balancing test that sought to harmonize the mandatory bargaining provisions with management rights. *Id.* at 426–28. In *Waterloo Community School District v. Public Employment Relations Board* (*Waterloo I*), 650 N.W.2d 627 (Iowa 2002), the PERB case that immediately preceded *Waterloo II*, the court cited the topics test "but did not directly apply it." *Waterloo II*, 740 N.W.2d at 428.

In *Waterloo II*, we sought to identify, once and for all, "the proper test for determining whether a proposal is subject to mandatory bargaining under section 20.9." *Id.* at 428. We first considered caselaw from other state courts and federal courts regarding how they resolve scope-of-bargaining issues. *Id.* at 422–25. We then thoroughly reviewed the evolution of our court's approach to resolving scope-of-bargaining

disputes. *Id.* at 425–28. *Waterloo II* ultimately clarified the proper test, *see id.* at 428–29, and it is this test PERB uses to adjudicate such disputes. [2]

Under the *Waterloo II* framework, PERB attempts to identify the proposal's "predominant purpose." *Id.* at 427, 429. This inquiry serves to guard against "the possibility that artful negotiators may attempt to craft proposals that incidentally involve [mandatory bargaining topics], but which are really designed to influence . . . policy or limit management discretion." *Id.* at 431. Proposals that only "incidentally involve" a mandatory bargaining topic cannot be said to have that topic as the proposal's predominant subject. *Id.* "When framing the scope of a disputed proposal topic, we are concerned with determining what the employer would be bound to do if a proposal were taken to arbitration and incorporated into a collective bargaining agreement." *State v. Pub. Emp't Relations Bd.*, 508 N.W.2d 668, 675 (Iowa 1993). A proposal's predominant purpose should not be decided "merely [by] looking for the topical word as listed in section 20.9" because this "virtually . . . mechanical exercise" is not the same as identifying the predominant characteristic of a proposal. *See id.*

In a typical case in which PERB is able to identify the predominant subject of a proposal, it next asks if that subject is "definitionally within the scope" of a topic listed in Iowa Code section 20.9. *Waterloo II*, 740 N.W.2d at 425. If the answer to that question is "yes," the proposal is a mandatory subject of collective bargaining—subject only to the limitation that proposals are not subject to collective bargaining if they are

---

[2]Both the State's and AFSCME's briefs accept the use of this analytical structure.

"preempted or inconsistent with any provision of law." *Id.* at 429 (describing the question of whether a proposal is illegal as the second prong of the analysis). The list of seventeen mandatory bargaining topics thus presents a "legal shooting range" and an employee organization "must hit one of the targets, or come close enough to one, in order to avoid characterization of the proposal as permissive." *Id.* at 425.

In holding that the first, and typically determinative, inquiry is whether a proposal presents a mandatory bargaining topic, *Waterloo II* necessarily "reject[ed] the notion that the issue of negotiability should ordinarily be resolved at the outset by balancing the employer's interest in management rights against the interest of employees in mandatory bargaining." *Id.* at 429. We held: "By creating the section 20.9 laundry list of exceptions to management prerogatives, the legislature has already done the balancing. There is no occasion for this court to judicially rebalance what the legislature has already balanced." *Id.* Yet, we recognized the need for a "balancing-type analysis" "in unusual cases where the predominant topic of a proposal cannot be determined" because "mandatory and permissive elements are inextricably intertwined in a proposal." *Id.* at 429, 431. In these rare cases in which a balancing analysis is appropriate, the employer's interest in management rights is weighed against the interest of employees in mandatory bargaining. *See id.* at 429.

**A. What Is the Definition of "Procedures for Staff Reduction"?**

PERB, the district court, and the parties all agree that an employer's decision to reduce staff does not fall within "procedures for staff reduction"; the State is free to decide to eliminate staff positions as a result of outsourcing or privatization and need not negotiate such decisions. PERB defines "procedures for staff reduction" to mean

"matters involving the order and manner of how a staff reduction will be carried out." The district court found PERB's definition of "procedures for staff reduction" too broad, concluding the word "for" in "procedures for staff reduction" is "a function word used to indicate purpose or an intended goal." The district court, therefore, defined "procedures for staff reduction" more narrowly, as procedures that "have as their purpose, goal or object a reduction in staff."

Because PERB has been granted interpretive authority under chapter 20, it is within its discretion to choose one appropriate definition of the word "for" over another. The *Merriam–Webster Collegiate Dictionary* defines "for" not only as "a function word to indicate purpose" or "an intended goal," but also as "with respect to." *Merriam–Webster's Collegiate Dictionary* 488 (11th ed. 2009). If a procedure is "with respect to" staff reduction, it is a procedure "for" staff reduction. PERB defined "procedures for staff reduction" as procedures that describe the "order and manner of how a staff reduction will be carried out." The phrase "order and manner of how" is simply another way of saying "with respect to" or "for." PERB's definition of the phrase "procedures for staff reduction" thus is consistent with a common meaning of the word "for."

PERB's definition does not otherwise contradict the plain meaning of "procedure," "staff," or "reduction." *Black's Law Dictionary* defines "procedure" as a "specific method or course of action." *Black's Law Dictionary* 1323 (9th ed. 2009). We have previously given the term "procedures" in Iowa Code section 20.9 a broad application, holding it is not limited to "a particular way of accomplishing something" or "a series of steps," but may also include substantive matters. *See Saydel Educ. Ass'n v. Pub. Emp't Relations Bd.*, 333 N.W.2d 486, 488–89 (Iowa 1983) (internal quotation marks omitted); *accord Pub. Emp't Relations Bd.*, 508

N.W.2d at 677 ("We have defined the term 'procedure' broadly in our prior cases interpreting section 20.9."). Based on these definitions, we conclude PERB's interpretation of "procedures for staff reduction" is consistent with the plain and ordinary meaning of the phrase and is therefore not irrational, illogical, or wholly unjustifiable. If a proposal "involv[es] the order and manner of how a staff reduction will be carried out," that proposal is a "method" "with respect to" staff reduction.

Accordingly, we disagree with the district court's reason for reversal. However, the State in the PERB proceedings and in district court urged an alternative ground for holding Proposal 8(B) is permissive—that its predominant purpose is staff *retention*. The district court did not rely on that ground. We may affirm the district court on this alternative ground urged by the State below and supported by the record. *See Hawkeye*, 812 N.W.2d at 609. We therefore turn to that issue.

**B. What Is the Predominant Purpose of Proposal 8(B)?** PERB found that Proposal 8(B)'s predominant purpose "is to designate a process for implementing a staff reduction that occurs due to outsourcing." The State argues that Proposal 8(B) is instead a procedure for staff *retention.*

The State argues that, because Proposal 8(B) requires the State to offer affected employees another position within the government, the State's workforce and payroll is not reduced. The State points to the language in Proposal 8(B) that requires the State to retain affected employees at their current pay grade:

> [T]he Employer *shall* offer affected employees other employment within Iowa State government. Other employment *shall* first be sought within the affected employee's department and county of employment. Affected

employees accepting other employment *shall not* be subject to loss of pay nor layoff pending placement in other employment under this Section. *Neither shall* such employees be subject to a decrease in pay in their new position.

(Emphasis added.) The State asserts:

It is entirely unclear how Proposal 8(B) could have been construed to constitute a procedure for staff reduction when, by the very terms of the provision, no staff can be reduced and . . . the State is precluded from implementing a lay-off of affected employees.

AFSCME defends PERB's identification of Proposal 8(B)'s predominant purpose. AFSCME asserts Proposal 8(B) "deals with measures to be taken as a result of staff reduction due to outsourcing or privatization of jobs." PERB on appeal argues, "[w]hile the proposal may require the employer to retain bargaining unit employees by offering them employment elsewhere, overall the proposal describes a procedure that occurs when positions are eliminated" and categorizes the State's argument as "akin to the expression of a glass being half-empty or half-full." PERB points out that the proposal does not require employers to retain staff generally or to refrain from reducing employees not in the bargaining unit.

We conclude a staff reduction occurs only when an employee leaves the State payroll, not merely when a particular job position is eliminated. As the Kentucky Supreme Court recently observed, "no one could reasonably argue that a job classification must last forever." *Webb v. Meyer*, 406 S.W.3d 444, 447 (Ky. 2013). The Kentucky Supreme Court further recognized "[t]here is a significant distinction between being transferred within one's employment and not having employment at all." *Id.* (holding "[i]f there has been no termination of employment, there has been no layoff or reduction in force"). We agree and hold a "staff

reduction" under section 20.9 requires "that there has, in fact, been a reduction in the total work force and not simply the substitution of one position for another." *Valdez v. Cantor*, 994 P.2d 483, 486 (Colo. App. 1999) ("We have failed to discover a single instance in which the term has been held to apply when the total number of employees has remained the same."). Accordingly, if the predominant purpose of Proposal 8(B) is staff retention, the proposal is a permissive bargaining topic. It would be illogical for PERB to conclude otherwise.

Yet, the record is inadequate for us to discern what, exactly, Proposal 8(B) will bind the State to do. It is unclear if Proposal 8(B) will result primarily in a position reduction rather than a staff reduction. At oral argument, counsel for AFSCME and the State discussed the actions the State could take—pursuant to Proposal 8(B) and other provisions of the collective bargaining agreement—in response to outsourcing that eliminates job positions. No clear consensus emerged as to what would occur. The parties debated whether the State must create new positions to accommodate displaced employees, whether the State could move affected employees only into open positions, or whether the State could "bump" other employees in order to create position vacancies.

AFSCME's counsel described what would happen as "a game of musical chairs," with some employees being terminated to accommodate those that had been displaced due to outsourcing. AFSCME's counsel asserted that, at the end of the day, some employees would be left without jobs. Under this scenario, there would be a reduction in staff. AFSCME's counsel expressed concern that a displaced employee could be moved into a new position and then terminated a short time later. AFSCME's counsel also expressed concern that a displaced employee could be reassigned to an impractical position—for example, a position in

in a faraway location—and such a reassignment would amount to a constructive discharge.

The State's counsel acknowledged "[t]he proposal is silent" as to whether the State could bump employees and stated, "I don't read in here that the employees have the right to bump someone else." The State's counsel asserted that displaced employees could only be moved to open positions, and no other employees could be bumped. The State's counsel suggested that other contract provisions provide procedures to govern when bumping can occur. The State's counsel stated, "I believe . . . this proposal . . . does not affect the rights of a separate agency, separate department. Those employees have their separate rights under [the bargaining agreement]." The existing collective bargaining agreement, however, is not included in the record. We are unable to determine from the record whether the State may bump or terminate other public employees holding positions to be filled by transferred employees who lost positions due to outsourcing.

All parties agree the decision to outsource is a permissive bargaining subject—it is a fundamental management power to decide to outsource. When asked at oral argument if "the ultimate decision whether to subcontract or outsource or privatize a particular set of jobs in state government is a permissive subject," AFSCME's counsel acknowledged:

> The ultimate decision whether or not we are going to privatize, whether or not we are going to close an institution, whether or not we are going to do something else that results in a reduction of force is, in fact, [the] prerogative of the employer.

Yet, the prohibition on reducing staff found in Proposal 8(B) is at odds with the State's authority to outsource.

Proposal 8(B) by its terms prohibits the State from involuntarily laying off any affected employee or reducing the pay of any affected employee. The employee can choose to resign, but can also choose not to resign. The State must find another position in state government for any employee who declines to resign. This effectively gives the employee veto power over the employer's ability to reduce staff. Under the State's interpretation, Proposal 8(B) is a procedure for staff *retention*, not reduction. Under this meaning of Proposal 8(B), it is illogical for PERB to find it to be a mandatory subject of bargaining.

The bumping issue, however, was not briefed by the parties or addressed by the rulings of PERB or the district court. On this record, we are unable to determine if the State would have the ability to lay off other state employees whenever required by Proposal 8(B) to offer positions to bargaining unit employees whose jobs are outsourced, as AFSCME contends. The factual record is inadequate to determine the realities of what Proposal 8(B) requires the State to do and how the other provisions of the collective bargaining agreement are implicated. Accordingly, we reverse the district court's ruling as to Proposal 8(B) and remand for further proceedings on that issue.

**IV. Disposition.**

For the foregoing reasons, we hold, to the extent the primary purpose of Proposal 8(B) is to preclude the State from reducing staff in response to outsourcing, it is a permissive rather than mandatory subject of bargaining. Nevertheless, if PERB determines on remand that the State is permitted to reduce employment by bumping employees after transfers resulting from outsourcing, then Proposal 8(B) can be found to be a mandatory subject of bargaining. We affirm the district court judgment on the issues not raised in the appeal. We reverse the district

court's ruling as to Proposal 8(B) and remand this case to the district court to remand to PERB for further proceedings consistent with this opinion.

Costs are assessed equally to AFSCME and the State.

**DISTRICT COURT JUDGMENT AFFIRMED IN PART AND REVERSED IN PART; REMANDED WITH INSTRUCTIONS.**

All justices concur except Appel, J., who takes no part.